don't worry about COVID. It's not as much the OMG variant isn't as bad as everyone says. So we have one huge case on the docket, which we will hear first. And then I'm sure we will take a break. We may even take a break in the middle of it. We don't know right now. But that case is number 1730610, United States v. Perry. Each of you has an assigned amount of time. And due to the fact that so many defendants appealed, we're going to hold you to your assigned time. So it's best if you make your most important points first. We have diligent law clerks who have read a very large part of the record. We're not going to say we have. And therefore, we will appreciate record citations and appreciate all of you, the diligence with which you are already representing your clients here. So with that, we will call the first defendant counsel. The defendant is Domaine Barnes, Ms. McIntyre. It's your honor. Thank you. Good morning. May it please the court. My name is Amy McIntyre of the Chaff McCall Law Firm. I'm appellate counsel for Damien Barnes, and I also served as co-trial counsel for Mr. Barnes, along with my colleague at the time, Peter Strasser. Because there's so many appellants in this case, counsels tried to divide our time amongst the various issues. My co-counsel will be addressing, amongst other things, the 924 issue, Daubert insufficiency of evidence. I'll be leading off and addressing the most critical issue that warrants a new trial for all 10 defendants, the McCaskill-Letter-Brady violation. Here, the government's racketeering case against these defendants was chiefly built upon the testimony of cooperating witnesses, the two most prominent being Daryl Franklin and Gregory Stewart. From 2013 through 2014, Franklin and Stewart were the lone cooperators working with the government. In 2015, a third cooperator, Washington McCaskill, suddenly agreed to flip as well. Trial commenced in our case in January of 2017, and at trial, the cooperator's testimony was repeatedly the only evidence in support of specific convictions. Months after trial ended, defense counsel discovered a letter written by Washington McCaskill and dated March 27, 2016. That letter was sent to Alex Kalinda, a specialist assistant U.S. attorney for EDLA and an assistant district attorney for Orleans Parish. In that letter, McCaskill confessed, our federal case is all made up lies, and Daryl Franklin and Gregory Stewart lied about a lot of things. To be clear, this letter was written by McCaskill more than a year after he'd been cooperating with the government, after he had been interviewed by the FBI and prosecutors for this case, and after he had implicated these 10 defendants. This letter should have been disclosed to the defense, and it would have been the single most important piece of evidence at our trial. I'd like to start with materiality, which is where the district court erred. Under the materiality standard set forth in Cosby-Whitley, all that is required is that the letter's suppression undermines confidence in the verdict. I would submit that it not only undermines confidence in the verdict, but it would have made a difference at trial, and I can point to three specific areas of the record. First, the trial testimony of the cooperating witnesses and the FBI agents. Two, the closing argument made by the jury, and three, the other letter written by Washington McCaskill to Kalinda, wherein he confessed to fabricating different charges, and I can address each of those areas of the record separately. You do. Explain to me, what do we know about this letter? It was undated. Do we know against whom it was submitted in state court and by whom? Yes, that is actually how we discovered it for this case. And I would refer the court to record sites 1563 to 1564, which I do not believe have been addressed in any briefing. So that record site is a portion of the government's brief at the state court level, which discusses the McCaskill letter. There was a related state court racketeering trial against related gang members, one of whom was named Kentrell Hickerson. And in that trial transcript, which was produced to us as Brady in our case, ADA Kalinda is examining Washington McCaskill on the stand. ADA Kalinda references this McCaskill letter, and he then submits it as a state court trial exhibit. So the district attorney gave it as impeachment as sort of Brady in the middle of trial. Oh, no, I'm sorry, Your Honor. We were never provided this letter. No, no, no. But it came to light because of a state prosecution. Yes, correct. Washington McCaskill wrote the letter to ADA Kalinda. And then in the state court trial, ADA Kalinda disclosed the letter to the state defense as Brady Giglio and then used the letter in that state court trial. Did you just say that the transcript of the state court trial was disclosed to you in the federal proceeding? Yes, Your Honor. The transcript in the Kentrell Hickerson trial was disclosed to us as Brady Giglio. And the transcript specifically references this McCaskill letter, and it was introduced as an exhibit. I would light of that, how can you say that the letter was suppressed since a direct reference to the letter was disclosed to you? In the state court trial transcript, they don't read the letter line by line. It's merely made reference in the scope of the cross-examination. There's a reference, though, to the letter that was written by McCaskill. Yes, but McCaskill wrote many letters to ADA Kalinda, and the government actually thought it had turned over the reference letter, the letter referenced in that transcript, to us in this case. But it was mistaken because it had in fact turned over many different letters, and it thought one of those different letters, but it had turned over to us as Brady was in fact the suppressed letter. Well, if there were a lot of letters, what makes this one stand out? This letter is critically unique because it is the only admission or even suppression or even a suggestion by a without rereading the entire record page by page. How do we know that? We can know that in four different ways. But again, before you get there, it's just, again, it's odd. If the transcript was given to you and there are references to Brady material and the district court, and you're saying it was a mistake, so there was no government really suppression. This was an inadvertency. I guess I'm not really seeing either imputation to the federal prosecutors or true suppression. Yes, Your Honor. I have a couple of points on that. And let me add, I sometimes I do this, but you didn't object to no hearing on this, correct? That's not an issue before us on appeal. I'm sorry, a defendant requested an evidentiary hearing to determine. But the district court didn't hold an evidentiary hearing. Correct. But you aren't arguing on appeal that that's reversible error. Correct. We're arguing that I understand from the government's briefing that if this court finds the letter to be material, they would request that the issue of suppression be remanded to the district court for further fact finding. We would submit that there is enough evidence and admissions in the record to show suppression here. And I think the most critical point comes from that 1563 to 1564 record site where the government admitted to the district court that they thought they had turned over this letter when, in fact, they had turned over a different letter. So it seems contradictory to now say they did not have a duty to disclose the letter in the first place when it has been discovered that what they turned over was not, in fact, the reference letter in the transcript. On the issue of suppression, 88 Colinda was admittedly an assistant district attorney. But on page 121 of the government's briefing, the government disclosed he was also a special AUSA for EDLA. The government has argued that there's no evidence in the record on that, so we should be remanded for further fact finding. I would argue that the government withheld his status as a special federal prosecutor at the district court level. We learned of it for the first time in the appellate briefing. So it seems a little bit unfair to be able to withhold that, to argue to the district court that he was merely an assistant district attorney and now use that withheld piece of information on appeal to say, well, we need more information on it. So it has to be remanded. Why would it, materiality, as you started out by saying, is the concept that a jury would have looked at the case differently. Please go back to materiality. Yes, Your Honor. We know this letter is material by looking at four different parts of the record. The first is the government's closing argument to the jury. The government's ultimate theory of this case was we know the cooperators have lied about other things in their lives. They've committed crimes. But you, the jury, can believe them because the defense has put forth no evidence showing they lied in this case. And how do we know from a cold record on appeal four years later that this was critical to the government's case? By looking at the government's closing argument. On record site 12-955, the government explicitly tells the jury in rebuttal closing, the defense has listened to thousands of calls and they've played you a few dozen. I would submit to you that none of them catch the witnesses saying, oh, I fabricated this giant indictment against these defendants. But the McCaskill letter does just that. The government even doubled down on it. Even if it does it, you were able to impeach McCaskill pretty successfully, in fact, using the jail calls. Your Honor, so if it's just cumulative of other impeachments, I would argue it's not cumulative. No one disputes that the cooperators were impeached on things like lying to girlfriends, wanting leniency, trying to cover up their own crimes. But that's very different than a post-cooperation admission of our entire case here is fabricated. That would be the distinction. I thought the jail calls had him post-crime saying Stuart and Franklin are liars. I believe, Your Honor, you're referring to a record site that was on page 121 of the government's briefing. And I too pulled, I'm sorry, 120 of the government's brief. And I agree that it's the closest thing we have here to the McCaskill letter because McCaskill tells a girlfriend that Stuart is lying about two murders. But if we look at the full quote of that transcript, which is on record pages 93-16 to 93-18, I think we see something very different. That's a phone call from McCaskill to a girlfriend in 2014. That is a year before he starts cooperating. And he's sitting in jail talking to his girlfriend. And he says on the call, Stuart's accused Jasmine Perry of committing two murders. But McCaskill says, Stuart must be lying because Jasmine Perry is still sitting at home a free man. McCaskill explicitly says, if Perry is home and not currently in jail for those murders, then quote, obviously it had to be a lie if he's free. Right? Question mark. McCaskill doesn't know anything here and he isn't confessing to anything. He hasn't started cooperating. He's sitting on a phone call speculating to his girlfriend that he knows the accused is still at home free. That's very different from a confession to a prosecutor post-cooperation that the case has been fabricated. Your Honor, I think you might also have been alluding to another record site in the government's brief on page 120, where the government says that McCaskill and Franklin said that, or McCaskill said Franklin and Stuart were essentially liars who had created the case and pushed everyone in. Once again, if we look to the full record site on page record 99-83, McCaskill says something very different. He's saying, because my co-defendants, because Franklin and Stuart were my co-defendants on a factual basis, but they were not charged, quote, they created the case, you know, they had them listed as my co-defendants, but they didn't have them officially, like, you know, charged. Once again, that's very different than a post-cooperation confession to a prosecutor saying that the case that he's testifying about has been fabricated. And I'd like to jump to one of the considerations we think about in considering materiality. And that is whether the cooperator's testimony was strongly corroborated by any other evidence. On this point, I'm going to mostly defer to the arguments of my co-counsel that they'll be making for their specific client, but I would like to highlight that the cooperator's testimony was the lone evidence in support of specific charges. For example, Ashton Price was convicted of the murder of Kendall Fabre based only on the testimony from Franklin and Stuart. Evan Lewis was convicted on the murder of Little John Haynes based solely on the testimony of Franklin and Stuart, even though he had an alibi. Damian Barnes was convicted on conspiracy to use a firearm in drugs transactions solely on the testimony of the cooperator, even though the photographs and wiretaps captured by law enforcement showed differently. In these examples and more, there were no other eyewitnesses to the crime. There were no videos, photos, or wiretaps. At most, there was ballistics evidence presented by the government that linked certain guns to certain crime scenes. However, it was very well established at trial that individuals had essentially two or three community guns that were passed around and used by a variety of individuals, including people who were convicted in the related state court case and were not defendants in our case. So at most, the ballistics evidence would show that a gun was at a particular crime scene, but not the identity of who was holding the gun. That came solely from the cooperators. If I may return to materiality, Your Honor. The two points you've made so far, closing argument and lone evidence, was to show materiality. To show materiality, the closing argument, I think, alone shows the materiality of it. This court in LaCasse v. Warden, which was cited in my Barnes reply brief, is a very similar case. And in footnote one of that case, this court looked at the closing argument of the prosecutor, where they emphasized the credibility. My only point was, you said four, you had four points. Yes, Your Honor. I don't think I interrupted Judge Higginson at the same time. We can also look at the testimony of the witnesses and the way that the government rehabilitated Dick Franklin and Stewart to know that this is material. For example, after Franklin had been impeached with multiple jail calls and telling other unrelated lies, the prosecutor rehabilitated him, because on record site 4826, the government says, oh, the defense has played plenty of calls catching you in other lies, but the defense has provided nothing showing that Franklin Mider put forth, quote, fake charges in this case. Once again, the LaCasse letter does exactly that. We can also look to the testimony of the FBI case agents who collaterally bolstered the credibility of these cooperators. I wouldn't, I guess, well, two questions. What's the, what do you see the government's primary argument here? It wasn't suppressed because you had it. It was suppressed, but it was, we didn't have it and we can't be imputed to know what the DA know. I don't see them even saying it's not material. I see them saying is it's not, it's not cumulatively. You impeached McCaskill so aggressively. This doesn't make a difference. That's sort of a harmlessness more than we're denying the material. Of course, this is impeachment. We would argue that it's not cumulative, given the very unique nature of the evidence and how. What's your best case where you impeach someone as aggressively as they did McCaskill? In other words, he's pled guilty. He's impeached with even with jail calls that he's a liar. I don't think he still reverses a conviction. In United States versus CFA, as far as the cumulative evidence argument, that's probably the closest because in that case, multiple immigration benefits were provided to the witness. Those were disclosed at trial and everyone agrees. The late disclosure of additional immigration benefits in that case was found to be material Brady, even though it was cumulative. And I see my time is up. I will address the rest of your questions on rebuttal. Thank you. Thank you. Thank you. I can Southern representing Evans Lewis. Good morning. I'm maybe the court. I'm Billy Southern. I represent your mask, please. We can't thank her. I've gotten so used to wearing a mask. I didn't notice I was wearing it. Maybe the court. My name is Billy Southern. I represent Evans Lewis in this matter. I've been involved in this case now for 10 years. I was initially appointed to represent Mr. Lewis in his initial case, 11, 1 0 7. I'm going to address the three issues. I, the primary issue I'd like to address is the issue concerning the admissibility of the ballistics evidence. But I also want to touch base just quickly on the Brady materiality issue with respect to Mr. Lewis, because I think the materiality question is different for each of the defendants. And I also want to address the sufficiency issue, which again, I think is unique to Mr. Lewis and with respect to the materiality point, the, I think the nuances that this isn't simply impeachment evidence of McCaskill. In fact, we would say that the statement, that his statement, that these are all made up lies is a truthful statement, which doesn't serve to simply impeach McCaskill. It serves to impeach the whole case, the whole investigation, this whole effort and its origins. Because the origins of this case are with Gregory Stewart. That's how this case came to light. This was not a shoe leather case. This was a case where Mr. Mr. Stewart ends up. I don't want to take all your time on McCaskill because Ms. McIntyre went into a lot, but I, the record is voluminous and it is an unusual Brady argument to say it was disclosed in a public trial, one that is highly related and yet the government still suppressed it. I was one of the lawyers on this case. We got 60,000 pages. You were one of the lawyers in the state case? No, in the, in the federal trial case, 11107 and 15154, both 11107 and 15154. Right. I know. But, but if an item is disclosed to the defense in a parallel state case, how is it not then available? How is that suppression? I think the first issue is we got 60,000 pages total. So that's a document dump problem. Yeah, it's not, that's not really a Brady issue under fifth circuit law. And we had this and the old, and like, I guess we could have gone to every record based document in any one of the hundred plus individual offenses that they aggregated together in this crime. Isn't that your obligation? No, I don't think, I don't think your case that the government's got to go. They haven't suppressed it. What Kyle, that's their obligation. It's not simply what's in their file. But, but in fact, this is in their file because it's a related, I shouldn't take you. Ms. McIntyre covered it well, and I appreciate real interesting arguments. Do you do criminal defense normally? Yes. Well, I thought criminal defense lawyers argued for decades that the government ought to have open files in these, in these cases. And we would love if they had an open file and they've got to tab it with everything that's Brady. Is that there? No, it was never provided to us. It was the 60, while we got 60,000 pages, one of the pages we didn't get was that letter. We did not get that letter. So it's not that they simply didn't identify the needle in the haystack. The needle wasn't in the haystack. The needle was in some other haystack. In the state court case. None of the defense attorneys were involved. None of us were involved. We were, we're all appointed, you know, we were appointed in this matter. I was appointed in this matter. Pretty smart clients, though, street smart. And not one of them mentioned it either. My client wasn't in that case. And my client wasn't in that. Well, according to Ms. McIntyre, a lot of the clients were, so. I would need to check my, check the record on that. But wouldn't one better argument to us have been, it was error not to have a hearing? Well, we argued that it was error not to have a hearing. But no one has preserved that to us on appeal. I believe we did. I think, I think we asserted that there should have been a, a motion from the trial hearing when it, when it came up. I think at that point, a lot of other things could have happened. We could have, we could have examined, we could have asked McCaskill about it. We could have asked Kalinda about it. Can you get back to your main arguments, please? Of course. So with respect to the ballistics issue, it's really, it flows through multiple different avenues. So there's a, the Rule 16 argument, there's a Galbraith argument, and a 702 argument. They all really go together. Under Rule 16, the, the government, when they're trying to bring in an expert witness, they need to give items that might be material to the preparation of the defense under 16A1F. And they need to give a summary of expert testimony. And the basic. I think I can simplify this. You did get the jenks before the witness testified. You got it before. No. No. I thought the government prosecutors themselves went to the lab. They came back. They gave it. And the district judge said, oh, government, here's the sanction. You can't use these. Defense, you can. We'll put the witness last. Is that wrong? So it unfolds in a much more complex way than that. So the, I guess also, I think to aid maybe in the consideration of this, it's various points in the record, but there's this chart that's in the record. And it's hard to see and hard to comprehend. But if you look, if you look, there are one, two, three, four homicides for which material was never turned over. Okay. Your objection or appeal is that Acosta's underlying documentation wasn't given to you in a timely way or given ever? Both. Because with respect to some of it, it wasn't given timely. With respect to four separate homicides, it wasn't given at all. But you got the expert report. You had your expert, Kweski. You didn't, Kluski, you didn't put them on or you did? We didn't. You could have put them on to say, all this documentation is an uncredited lab. The documentation is sloppy. That actually doesn't go to what the, so again, this really goes to the admissibility, not just the weight, there's a gatekeeping function that the district was supposed to serve. Of the three arguments you began to say, which is your strongest? Rule 16 violation, 702 Dolbert violation, or the third? What's your strongest? I think it's the 702 Dolbert, that the judge ultimately didn't provide a gatekeeping function. And the Rule 16 issue actually, it highlights the reliability. The fact that in a murder case, they can't come up with the underlying material should trouble us about the reliability of their methodology. But you can expose it in Cross. No, you can't, that's, see that's sort of looking at it from an ex-post perspective. But the admissibility is an ex-ante question. So if we're, if. So your argument really is the 702 one? Yes, and that the. What's your best case on that? And the ballistics is pretty well trotted expert area of. We're not, we're not, we're not claiming, this isn't the kind of case where we want an eyewitness identification expert to come in and there's a Dolbert issue, is it admissible, is it not admissible? We're not making some global ballistics challenge. We're saying that the methodology employed in this instance are unreliable. Not that the science is unreliable. The maintenance of standards is the third part of the Dolbert test. The standards weren't maintained here. I, at the day the witness ends up testifying, she comes in, she has an additional, I think, 430 pages that they hadn't been able to provide. She said she went by, she went herself to the NOCD lab to look for these materials. I sort of imagine it when you pull out a, a file cabinet where you have the stuff rolled up in the back or sort of stuck underneath, I don't know where this stuff was. But 430 pages on the day of trial, on the day of her testimony she, she provides. So the judge Zaney did a pretty, he said to the government, you're out of luck now. You can't use these stuff. They, they, actually that ruling was, was I would say that, that, that ends up being no ruling at all because in the end, one, two, three, four homicides, four homicides, right? Those could be four separate murder trials. Are you, are you, I thought you were representing Lewis. Yes, Your Honor. He was only, was he convicted of one homicide? He was convicted of one homicide. And significantly, he was, he was convicted of one of the homicides for which the ballistics evidence was never produced. So when we look at the, when we look at these, each red, each red mark is a gun. Each square block with a little blue highlight. I, I, I can't see that. But I understand what you're saying. Is a, is a, is a murder, right? So the, like, this is the expert report I take at Acosta Claims looking at the ballistics that implicates your client. And then your point, then your point is you want to cross-examine, examine because actually there's nothing to support that report. Why wasn't that available to you? Not that there's nothing to support the report. It's that the underlying materials were not provided so that there's no possibility of independent testing and review pre-trial as Daubert and 702 require. And this, this court has said that the Daubert inquiry needs to be a pre-trial inquiry. The Carlson case, Carlson versus Bio-Remedy, the judge must make, the district court must make a pre-trial record, not necessarily have a full-blown hearing, but has to make. There's no other evidence connecting your client to that murder, and you'll forgive me because there are a lot of murders. Or the other evidence concerning that murder is the testimony of Gregory Stewart and Daryl Franklin. That's, that's it. On the other side of the ledger, Mr. Lewis, or you know, I call the witness, Edgar Barabino, he came up and testified. He was with Mr. Lewis when this occurred. Mr. Lewis didn't commit that murder. Mr. Lewis was acquitted of two, completely acquitted of two other homicides, the two other homicides for which he was charged. The ballistics evidence was. How many years before trial and Acosta's testimony was the, was the ballistics examination done? How old is the guy? I think in the preceding three or four years would be, would be my estimate. I don't know the, I mean, it's not ideal, but the government's got sort of in the position it's in, this lab clearly had problems. And so what do you, what's the Dobear case that says, like, you're basically saying Acosta shouldn't have been allowed to testify under 702 and Dobear because of records that are sloppy? Well, I think. What's the case that says that? At some point, well, the Daubert itself, Daubert said. I know, but do you have any case where a court has found reversible that an expert was allowed to testify because the underlying records were sloppy or no longer? We do. We have a ballistics case and it's cited in the brief. Which one was that? Do you remember? Oh, that's right. It's cited in the brief. So, you know, that's the hard reality is that sometimes if the expert evidence isn't reliable enough, you're going to have to exclude it. Even if it's, even if it's super important, even if it's the, and maybe especially if it's super important. I'm just thinking that probably the better is you just, you crush the government with cross-examination. You put your own expert on and you say, you can't believe anything. She can't even soak any underlying documents. But we can't even meaningfully do that because our expert says that there's no way to meaningfully engage her analysis without me doing the whole analysis myself, which then means it's not really scientific. Okay. Did you have a third point? I don't mean. I just want to briefly go in my 52 seconds to the sufficiency argument. Darryl Franklin testified that he was against and tried to prevent Mr. Lewis from killing little John Haynes. That's what he testified to. The government says in its indictment and throughout the trial that Darryl, that what the 39 is, is, is an organization run by Darryl Franklin. They say Darryl Franklin calls the shots. He decides who gets murdered. Assuming for this argument that Evans Lewis participated in that murder, that that murder occurred, how on earth could that be a violent crime in aid of racketeering? How could that have maintained or increased Mr. Lewis's role in the 39ers as a VCAR homicide would require? So there, the intent element is just entirely absent. Maybe Mr. Lewis and the other men who are alleged to have done this, maybe they had some other motive. Maybe there was some other conspiracy, but it wasn't the 39ers conspiracy because the 39ers conspiracy is what Darryl Franklin wishes. He's the leader. And in fact, McCaskill ends up so enraged by the murder that he ends up coming to, coming to try to kill whoever killed little John Haynes. So if, again, if the 39ers is anything, it's this entity of these downtown guys and these uptown guys and the uptown guys wanted to kill whoever killed little John Haynes. Thank you very much. Mr. Responsi representing Curtis Neville. May it please the court. My name is Michael Responsi representing Curtis Neville. Today I'll be discussing certain aspects of the confrontation clause violation claim Mr. Neville makes with respect to the introduction into evidence of the four of non-testifying co-defendants at trial, particularly I wanted to focus on how they're facially inculpatory and certain arguments the government makes in opposition to this claim. Now, the factual basis of co-defendants Evans, Lewis, and Jasmine Perry are facially inculpatory towards Mr. Neville, largely due to the fact that they both describe how a co-conspirator went into 1809 Desire Street, which the indictment establishes as Mr. Neville's side, the co-conspirator observed multiple AK-47s and Lewis and Perry with handguns. The government has conceded that this, the inclusion of this language was error under this court's opinion in United States versus Nuttall and I bring that up because also in the government's arguments, they make certain references to jury instructions provided by the district court specifically that they are not to disregard any redacted portions and that they're not to indulge in any sort of speculation. So again, the fact that the government has conceded that this was error under Nuttall means that the government is conceding that the factual basis is facially incriminating towards Mr. Neville. So now that we've accepted that that is what that is, it falls under the category of Bruton, Richardson versus Marsh, and Gray versus Maryland, such that the presence of any limiting instruction by the trial court largely becomes irrelevant. That's, that's the crucial holding of the Bruton case is that when you have a co-defendant statement that incriminates another defendant, we can no longer presume a jury is going to follow any instruction to limit its use. Bruton is difficult doctrine, but it is obviously implicates the other. Right. And this case is, this court's Nuttall opinion says that the inclusion of a defendant's address, like it did here, is tantamount to naming the actual individual. I thought there was other evidence where other people testified to the presence of guns at Mr. Neville's location. There was two handguns that were recovered pursuant to a search warrant of his house where Mr. Neville was not present. There was a very small amount of drugs and two handguns that were found in a bedroom dresser where they had some pink fingernail polish and his mother and sister were present in the house. This is different from in the context of a, this is why I'm guilty of a drug conspiracy. I didn't make that argument in closing, right? This was clearly inadvertent. It was a missed redaction. You don't dispute that. Yes, I don't necessarily dispute it on that if that's correct. And it seems to me, so why aren't they right? That we would be reviewing this specific argument, the Nuttall argument for plain error only because you missed it. They missed it when it comes in. No one spots it. They don't argue it in closing. It just slips through. Is your only argument that we were reviewing DeNovo because you objected at the outset to any factual basis? Right. So this was probably the most litigated aspect of this case. The introduction of these guilty pleas and the government's use of these guilt. I agree that trial and we, but then there are massive reductions, redactions. When you look at these things, they're somewhat unintelligible. They basically, I would have thought help your case because they basically say Franklin and Stewart were massive drug dealers, the people cooperating with the government. They say almost nothing about anybody else. Well, almost. There's two slips. That's true. So the, the use of, yes, we objected saying with redactions, without redactions, there's still going to be a huge problem with the use of this evidence and how it's going to satisfy the government's burden of proof largely with respect to all three of the conspiracies charged against you. Once the court says we'll redact and massively did redact, isn't it your obligation to say, wait a minute, it's still obviously implicates me. I would say that, yes, there's a burden on both the defense and I suggest the prosecution as well to make sure the arguments or the evidence is constitutional. But in summation of run out of time, under either standard, I don't think that the pervasive use of this evidence at trial by the government leads, should lead this court to have the conclusion that there is a reasonable probability that this evidence contributed or may have contributed to the guilty verdicts of counts one, two, and three of this case. Okay. Thank you, sir. Next, we'll hear from Mr. Plaisance of Terry Esonni. Good morning, Your Honors. I represent Terry Esonni, but in general, I'm arguing also on behalf of my co-defendants who've adopted the same argument. I want to just point out real quick in my three minutes. Let me ask you a question about these adoptions of arguments. I thought, I'm just, and I should have looked it up in advance, I thought we normally didn't allow co-defendants to adopt each other's arguments. Well, in this case, it seems the court did and we did. I mean, we certainly adopted to not have to replicate and repeat. I understand. Was there a motion to adopt or something like that? There were letters under the rules to adopt the various arguments. There were letters? And parts of briefs. Okay. Well, just wondering. Thank you. Yes, Your Honor. This is an issue that comes up in most of these type cases and I think that this is a prime example of why there should be severance. You know, you've heard so far of multiple defendants. There's thousands of pages of documents. There were objections. I can point out to you specific pages, but to make it easy on Oni's brief, page 95, I mean, 86 to 87, cites at least four occasions where he specifically moved to sever the case, one's pretrial and three in the middle of trial, because it became cumulative as the evidence was presented to these defendants that there were more and more, much more evidence coming out that was prejudicial to them than would help them. For instance, I pointed out in Mr. Oni's brief that there were four instances where evidence came out from co-defendants that basically it would be other crimes evidence or certainly not admissible against him, perhaps in a single trial. And it went that way. You're already speaking in a conspiracy, big conspiracy. You're going to try them all together. But what, what would my concern in this case, the biggest issue I have is the Bruton tied to the severance issue together. What strikes me as unusual is where our government charges a drug conspiracy, then recharges the drug drug conspiracy. And four of what 11 had pled guilty to it. Right. That's correct. You find a case with that alignment, I'm not sure it's a severance issue. I think it's more Bruton issue. And you, you're probably right, Your Honor, from that aspect, but the best, you know, I could in my 17 seconds, you know, it's, it's but look at it hard from a severance perspective, because I mean, that gives you the roadmap. And then you had the McRae case from this court involving the New Orleans police department and the murder of Dr. Katrina, which were kind of along the same lines. And y'all reversed and said, you know, as the case progressed, it became more and more obvious that severance and, you know, trying all these cases together is not proper. Historically, was there any defendant who was charged with more murders than your, than your client? Not that I recall. So if there was prejudice from severance, it went toward the other defendants and not toward your client. Well, not according to my brief and the specific footnotes that I found and the direct citations to show where, where, where this material came out that, that was accusing him of even more, you know, and Your Honor, I'm gonna wrap up by saying, I understand that, you know, if you reverse forward and he's still guilty of one, he's still guilty, but that's not the point. Justice demands that we articulate and argue each count for each individual defendant under the Constitution. Thank you. Ms. Ottinger representing Jasmine Perry. Please. Yeah. Hi, good morning. Sarah Ottinger on behalf of Jasmine Perry. I am going to briefly touch on insufficient evidence, which because of the motion for Novo, and I will be addressing it with respect to my client, Jasmine Perry. In a concurring opinion joined by Justices Frankfurter and Murphy, Justice Jackson had this to say about multi-defendant conspiracy trials. A co-defendant in a conspiracy trial occupies an uneasy seat. There generally will be evidence of wrongdoing by somebody. It is difficult for the individual to make his own case stand on its own merits in the minds of jurors who are ready to believe that birds of a feather are flocked together, and I think that that was precisely the problem in Mr. Perry's case, and I would ask the court to carefully scrutinize specifically the evidence against Mr. Perry. I'm not talking in broad terms about birds of a feather, and so with my very little time, I'd like to make some very specific points. First of all, Mr. Perry was not depicted in any of the photographs, any of the music, any of the materials that were submitted indicating that people were members of the 39ers. He was not included in any of that, and he did not participate in the conduct of the trial. So I would like to make a very specific point about that, and that is, first of all, Daryl Franklin described Mr. Perry as a nobody, he wasn't nothing, so he was not a member of the 39ers, there was not sufficient evidence. Second, I would like to address briefly what I find to be a very representative example of the kind of thing that jurors were asked to do in this trial, and based on the kind of evidence that they were asked to do it. I've submitted an exhibit for oral argument that I believe Your Honors have, all of the citations to the record are in there. This concerns the murder of Kendall Fave and the shooting assault of Jasmine Jones, who survived. And I think what you will see from this chart and the record sites is that the 2010 investigation, at the time that the crime occurred, indicated a completely different scenario than the testimony at trial. The testimony at trial was only from cooperating witnesses, which again is a materiality issue with respect to Brady, and it contradicted witness statements, all the witness statements. And so what I have set out is very specific allegations of what witnesses observed, completely contradictory in 2010 to the testimony in 2017 of these cooperating witnesses. One last point, if you'll allow me, is that when you look at the record sites, the transcript to the 7,000th in the transcript, and to ask the jury to keep track of that in any rational way, which they obviously didn't in this case, it's simply undoable. Thank you. Thank you, ma'am. Mr. Sandhu representing Alonzo Peters. Miss, excuse me. May I please report? My name is Nisha Sandhu, and I represent Alonzo Peters. Mr. Peters was convicted of conspiracy to violate RICO, conspiracy to distribute drugs, and conspiracy to use, carry, and possess firearms. In each offense, there must be a connection between the accused and the enterprise. Primary issue for Mr. Peters is that there was no evidence connecting him to the enterprise, or that he acted with the knowledge or intent or for the purposes of furthering the 39ers. He was not an agent of any member of the 39ers or an agent of the 39ers. Is the strongest contrary evidence that Stewart did testify they were in the hotel selling drugs together? Yes, sir. And wasn't that enough for the jury to make a connection? Well, Mr. Peters was convicted basically of guilt by association. Yes, he knew Gregory Stewart, but Gregory Stewart used Mr. Peters under the auspices of, well, to rent hotel rooms so he could, he told him so he could have women over. Mr. Peters didn't know the exact activities that Stewart was engaging in. Yes, Mr. Peters knew the wrong people and was convicted of what, I mean, guilt by association is referenced in United States v. Elliott. Under the circumstances of this case, I would argue a reasonable jury could not dismiss that Mr. Peters acted independently and distinctly from the 39ers. Assuming for Peters and Perry and for all of them, a mere presence instruction was given? It's not sat, I mean, so that's an argument. Yes, but overwhelmingly, I mean, there were how many, I mean, I think the jury was overwhelmed with all these crimes, with these photos, with, I mean, it goes without saying that he was subsumed into this vortex and really that's what it was for my client, Mr. Peters. Thank you. He wasn't a member of a drug trafficking conspiracy at all. He was merely in a buyer-seller relationship. That's what I would argue. Yes, ma'am. Okay. Thank you. Okay. Mr. Bosworth for Ashton Price. Good morning, your honors. My name is Graham Bosworth. I'm arguing on behalf of my client, Ashton Price. I'm not sure how to winnow down 28 days of trial into five minutes, but let me start by just piggybacking on Ms. McIntyre's argument. Given each of you 20 minutes. I would have loved it, your honor. Sure. But let me start by saying that relative to materiality to any sort of Brady, but also to the separate independent issue of actual sufficiency of the evidence, the state failed to establish by any convincing evidence that my client was involved in any conspiracy. When you look at the case, you will see that the only evidence against them were the three testimony, excuse me, the testimony of the three cooperating witnesses. Every other piece of information in this case contradicted their testimony. You had a multi-year investigation with over 26,000 recorded phone calls, thousands of surveillance photos of drug sales, drugs, transportation, drug markets. My client didn't exist in any of it. Special agent would testify that in his multi-year involvement in this investigation, he had no idea who Ashton Price was. He'd never seen him before. They had no evidence against him. He only shows up in this case when Gregory Stewart point finger at him. Gregory Stewart, who admitted on the stand that he had a beef against Ashton Price because he'd made fun of him in a rap song. That is why Ashton is there. And by including him as a defendant in this case, the government was then able to introduce those rap songs in the trial. That is why he exists in this case. But there is no evidence linking him to the conspiracy. In fact, the three other flip witnesses, Vanity, Vincent, Tyrone, Nakum and Rico Jackson, all admit they don't know who Ashton Price is. He wasn't involved in any drug sales. He wasn't involved in a conspiracy. Vanity, Vincent gives a list of every member of the 39ers and he's not on it. You also have the testimony of Jamal Holmes, who said, I worked intimately with his organization. I bought drugs from him. I don't know why Ashton Price is here. He was only a rapper. Every single piece of information that was given, other than the testimony of these three witnesses, his credibility is obviously compromised. Where did he get the information to talk about whoever it was who got shot with his brains pouring out on the floor? In terms of the rap songs? We don't know. It's speculation. Who wrote that? Happens to know about it in the hood. Or he was paid to rap that song as a employee of the Dusty Money Records. For some reason, the jury convicted him of that murder, didn't they? That is true. But if the mere fact that a jury convicted someone was the end of the discussion, we wouldn't have a sufficient evidence about the murder. Not only was there no evidence, when you look at the evidence of the Kendall Fabregant murder, the actual testimony and evidence in that case, again, contradicted the flip witness. Gregory Stewart said that there are three shooters. Ashton Price was one of them. The surviving victim of that, Jasmine Jones, said no. She identified an individual named Deloitte Jones from a rival organization, the Ryder Diagang, who has his own case that's come through this course. OK, you're making a pure sufficiency argument or you're saying reversible error also on admitting the rap videos at all? I've made that argument in brief, but I'm focusing on sufficiency here because I only have a minute. They filed a 20th J, citing the Sims decision. Do you have any comment on that as to admissibility of rap videos? I think it's distinguishable. I think it's distinguishable in terms of the failure to establish authorship and to establish. Time is so precious on a pure sufficiency argument. And how do you pronounce the deceased's name, Fabregant? Your argument is nothing connecting your client or your argument is, yes, murder, but it had no nexus to the purpose of the 39ers. It was a rejection. First off, it wasn't him. The surviving witness says it was not him. The surviving witness was also corroborated by an independent witness. I'm very interested just because I think our law is a little difficult for me to decipher in terms of the nexus. OK, and then in terms of the nexus, even if you take Stewart's argument at face value, he said that this was a personal beef about some issue in Press Park that had absolutely nothing to do with the alleged 39ers conspiracy. He admitted it had nothing to do with the conspiracy. It was, according to him, some beef about some issue that happened out in a completely different area of the city. So even if you were arguendo to say that, OK, I think he was involved in this murder, it still doesn't reach the... What was the purpose of the interpose? Was it to traffic drugs or to just inflict violence? According to the government, it was to traffic drugs and the violence was associated in terms of protecting their territory and their drug trafficking. Taking the government's argument at face value, this murder had nothing to do with any of that by the testimony of their own witnesses. I've run out of time. Thank you. Thank you very much. All right, Ms. Tan from McCoy Walker. Good morning, Your Honors, and I plead with the court. I would just like to briefly address this court's prior question about the adoption issue. I believe many of us adopted each other's arguments using Federal Rule of Appellate Procedure 28I, where you are allowed, when there are cases involving more than one appellant, to adopt arguments and we may join in each other's briefs, which is essentially what we did, given the size of the record. I thought, right, fine. I would, on behalf of Mr. Walker specifically, like to discuss sufficiency of evidence as to my client. First and foremost, the court had asked questions previously about the nexus. For Mr. Walker, addressing the murders with which he was charged, the government failed to prove a nexus connecting those murders to any enterprise or organization. Mr. Walker is not necessarily admitting that he was part of any enterprise or that one existed. But, for example, the murder of Lester Green, there was no evidence presented at trial to show that this was a murder connected to his role in an enterprise or for gaining entrance to, maintaining his position, anything connected to a conspiracy. As to the Hampton and Lowe murders, there was an allegation that Rico Jackson had witnessed Hampton kill someone in Texas and that he had given information about it, that Hampton was aware of this and that that was particularly a motive for this murder. Ms. Lowe, unfortunately, was not the target, but she was in the car, so she became a murder victim. But the mere fact that this was an issue involving a potential snit situation, the government tried to argue, well, he is from the Calio, so this is a longstanding feud between these neighborhoods. But merely because you have different neighborhoods that don't like each other doesn't mean that that is a murder that could be connected to an enterprise. There's not a nexus for those. And as much as it's distasteful to say, even if Mr. Walker did commit these murders, his conviction can't stand. This court found something similar in the Jones case, Jones 1 from 2017, and the specific site if the court wants that one is 873 F 3rd 482. And there were two murders in that case, Sidney Patterson's convictions were reversed because they couldn't connect those murders to the enterprise. That's the same thing with the murders for Mr. Walker. They can't be connected to membership in entrance into raising his position in any sort of enterprise. And the difficulty for me applying Jones 1 is violence does tend to enhance the strength of the game. It intimidates others. But then Jones 1 says you need more than that. Oh, I mean, first and foremost, if there is a game, which, again, Mr. Walker is not a game, but violence by itself doesn't necessarily enhance membership in a game. It doesn't enhance the role of that game. If that's the case, then all Philadelphia fans could be considered a game because, unfortunately, you know, fights break out after games. And I used the analogy in my reply brief. And I'm going to use it again. If you're a member of a gang, you're guilty of the Vicar. Any action? Well, I mean, that's essentially the argument that the government wants, wanted the jury to believe here is that we have all of these people and we can classify them together because of the neighborhood. And so we're going to do that. We're going to claim that this neighborhood is, in fact, a gang. And so any involvement with and government's evidence showed this is just a massive gang and Stuart and Franklin runs to sell drugs. And, therefore, the connection has to be this violence, this murder helped us sell drugs. And that would, yes, that's correct. But the murders involving Mr. Walker here didn't help them sell drugs, didn't help them enhance their position. Well, I mean, is it just a coincidence that co-defendants LeBroy Price and Terry Isoni are both convicted of the murder of Lester Green? And is it simply a coincidence that Terry Isoni is also connected with the murders of Hampton and Lowe? In other words, if those people are gang members and your client is a gang, is he's just shooting people for fun in his conviction, but it's not related to the gang? And my time is up. Would you, the court, like me to answer the question? No, Your Honor. Mr. Walker is not shooting people for fun. But, again, I'm not necessarily conceding that there is a gang here. You know, there may be a neighborhood where people are friends, where they grew up together. You know, you have a familiar connection between some of the defendants in the case that doesn't automatically make them a gang or an enterprise. Thank you. Thank you. Am I correct that we do not have someone arguing for LeBroy Price here? Okay. Great. Thank you. All right. Mr. Lemon for Solomon Doyle. May it please the court. Well, this case was tried on the theory that a RICO conspiracy was a crime of violence and that Mark Fine's immunity agreement, which is the only one that has an immunity agreement, existed but had been breached. That's what the jury considered, the trial judge considered, the defense lawyers considered. That's what the case was tried on. Then, after the trial, this court, and I may say correctly, decided Jones 2, which says that a RICO conspiracy is not a crime of violence. Since then, the government has been tiptoeing all around the issue. They've changed positions so many times that it's hard for me to keep track of. The last case that they submitted, Capers, ironically, is a good, appropriate name for the government's case, their theory in this case, what they've done. They keep going back and forth. So, after Jones 2, McLaren was decided. And McLaren said, well, wait, a conspiracy is a crime of violence if it's a harmless error, as long as it's harmless. But then Capers said, no, it's not a harmless analysis. Quick question before your time runs out. You had a non-prosecution agreement. I had what? You filed a motion to dismiss. Isn't, if the government breached, wouldn't we be assessing it at the time of your motion to dismiss? It wouldn't relate to Rule 29 or sentencing, right? I agree. In other words— Therefore, the acquittal on the violence, the substantive counts doesn't help. What the government has done in this case, Your Honor, is they've presented to you all a situation that the trial judge—or issues that the trial judge never considered. Never considered. This whole notion about whether a conspiracy is—all of that, they want you to decide when the trial judge was on a different scenario. I know your time's up, but if I can ask, just what is the decision that was adverse to you? What specific decision was— Guilty on count one. So you're challenging Rule 29 based on a government breach? Sir, see what I mean? Judge, I've been fighting the whole thing from day one. I've been saying, as an old law professor, that a conspiracy is not defined by the object of the conspiracy. It's simply a crime. Telling this jury repeatedly that this is a crime of violence in today's life here is like waving a red flag in front of a charging bull. It simply was not that. Now the government, as far as my client is saying, oh well, he really was only convicted of a nonviolent crime. But his immunity agreement never existed. Now, the judge never decided that. They want you to decide that. And Judge Smith, in some dissenting opinions that I believe your Honor, Judge Jones joined with him, was furious about situations where this court is called upon to decide issues that the trial court never considered. The grand jury never considered their current theory. None of us did. The trial judge doesn't even know about all of this. That's all I have to say. Thank you. All right, Mr. Boydman. Judge Jones, may I proceed? Yes, sir. May it please the court. I know there's been a lot of briefing and a lot of argument. What I'd like to do is briefly address the topics that have come up and try to address any questions that have come up. I'll try to keep it in the order I can. But if I may, Judge Jones, just a quick housekeeping matter. You've been asking about adoptions. Counsel is correct. They did file 28I letters. I saw a couple of those. My, what I recalled was that when you adopt a co-defendant's argument based on different facts, it's not much of an adoption. That's our understanding as well, Judge Jones. And you'll see throughout the brief, in certain parts, we footnoted where we agree an adoption can happen and an adoption may not. I don't want to belabor the point, but that's in our briefing, and you'll see that. I'll begin with the Brady issue, Your Honor, and specifically with the McCaskill letter that was brought up. And all of you asked questions relating to materiality. That was the focus of the district court here. The district court found it was not material because these defendants were inexorably impeached by 10 attorneys over hours and hours, weeks of trial. And that's the correct issue here. If you take a look at what this was, as Judge Higginson, you pointed out, we're not denying that the letter would have been favorable. No doubt about that. But this is basically a cumulative impeachment. And you take a look at the letters. First of all, there was a number of items that were disclosed for impeachment purposes, and this is cataloged at page 1554 of the record, note 76, of just an example of some of the impeachment that went over. There were several letters that McCaskill wrote that, as counsel acknowledged, did go over. To be sure, this was this particular letter, and just so there's no doubt of the position, the federal prosecutors did not have this letter during trial. It was not something the federal team withheld. Going to your question about imputation here. But are you asking us to rule that way, where there was no hearing? I mean, it was a joint task force case, and there are ADAs that are special AUSAs. Without a hearing, it would be very hard. What would be the case that would allow us to say, okay, you didn't disclose something that the state prosecutor's in a joint task force case? Is the imputation the way to go here? No, no, obviously not, Judge. I can say we're not asking the court to rule that. The government's position is that it is not imputed, that the state ADA who handled this was not part of the federal prosecution team. Right. But I'm asking you what case would support that argument on this record? Because it was a joint task force case. It's a historical state case picked up by the federal government. It's pretty hard not to say it's one. You see what I mean? I'm not. What's the case that would, on this record, say no attribution? Well, I don't have a case specifically, but I would say one of the reasons you can is exactly because of the facts that you mentioned, which we don't necessarily agree with. I don't think this is one where this particular case was entirely picked up from the state. And I don't think the record indicates enough. I thought it was a joint task force investigated. There was a multi- I'm going outside the record briefly. That's all right. Your primary argument is cumulative harm? Yes. Okay. So therefore, were my questions misdirected in terms of, to opposing counsel, that actually everyone had this letter? Because it's in the public domain. That was a position we took in state court. The district court did not agree with us, did not necessarily say no, that it still was a Brady and you had to turn it over. The district court did not rule on the imputation issue. The district court just disagreed that something in the public record would relieve the federal government of its Brady obligation. The government did not take that position. The government argued that this was in a public record. Judge Duncan, as you pointed out, the transcript mentioning this was turned over. I think you pointed that out as well, Judge Higgins. And somehow this letter was just left out. The letter was left out. And if you take a look at the transcript, it talks about a government exhibit. And there may be a disagreement here of counsel. I believe the letter that is being cross-examined in the state case is actually a letter that Washington McCaskill had involving Kevin Jackson, which was disclosed. But part of that state exhibit did include this McCaskill letter. For whatever reason, that didn't get over to the federal. What's the most cumulative piece of impeachment evidence used against McCaskill? I think specifically pages 9319 to 22 and 9909 of the record, which is referencing jail calls where counsel first got the jury to hear from Washington McCaskill that he thought Gregory Stewart and Daryl Franklin lied about a lot of things, specifically that they dug a hole, pushed everyone in. They joined me in a case with people I never ran with, and they created the case. And then counsel for Evans Lewis, this is at page 9909, used a jail call to get Washington McCaskill to admit that he was talking about Gregory Stewart and Daryl Franklin when saying those people lied and saying, I felt they were lying about certain things. Now, those were not, I think those are very good pieces, but they're certainly not the only pieces of impeachment to show that the cooperators had lied on occasion. And if you take a look at pages 115 to 120 of our brief, we have cataloged a lot of the about all three of them, everything the jury heard. And if you're looking for more, refer the court to pages 1567 to 69 of the record, which is the government's opposition to the motion for new trial, where the prosecution team in the district court outlined all the times that these witnesses were impeached, as the district court said, inexorably impeached. And so that's really where the cumulative nature comes to this. If they were impeached 100 times and told that they were lying 100 times, this is the 101st. And it's basically the same thing that was happening before. Washington McCaskill believed Stewart and Franklin lied. That was well known to the jury. This is one more piece. We're not happy that it happened this way. We're not happy they didn't have it, but it's not material. It doesn't provide a reasonable probability that the verdict would have been different in light of all the evidence.  They knew that these cooperators had killed people several times over. They knew about the benefits they were getting, how they hoped to get out of jail. They had heard lies, lies, lies. They had heard the cross-examination of 10 defense attorneys throughout, and the jury knew that. So there's really no materiality finding. The only reason I bring up the imputation, Judge Higginson, is if the court disagrees and finds that, no, had this been in the defense's possession, that it would undermine the verdict, we don't have that answer on imputation. We don't have a finding by the district court as to whether the state ADA was a member of the federal prosecution team, and I don't think on this record you could have it. And as we've mentioned in the brief, if you reach that conclusion and find you have to reach that, although de novo review applies, I don't think this record would allow for it. And that's where I think you would have to remand for a question of the scope of the prosecution team and imputation. But again, I think you can affirm on the basis, the same basis that the district court, who presided over this trial for six weeks, who know the jury, who saw the witnesses, and who was involved in all of this, made the decision that it's not material and therefore not a Brady violation. Moving on to the ballistics argument, Judge Higgins, I believe you asked opposing counsel about, you did get this before the testimony. The summary had been given over, the summary and the basis for it. The underlying things did not get over timely. When you say timely, they still got there before Acosta testified. So that technically is timely, Jenks, but the argument was made actually substantial portions just never were given over. Agreed. And I think when all came to shove, I don't know the number offhand. I believe Mr. Southern may have said four or five, and I'm drawing a blanket that's right, that there were a handful of the underlying things that didn't get through, but overwhelming majority did. And so when it comes to the issue of really whether that prejudiced, I believe, Judge Higgins, you asked counsel, why didn't you put the expert on the stand to attack? I would say it wasn't done, but it also wasn't done in the context of the new trial either, after more things had been getting, so there's really been no showing that this did prejudice. As far as I know, there's been no expert that has called the fact, said witness Acosta's findings were incorrect. I think there's been talk about the way it was done, and maybe take an issue with that, but I don't think it's been about the findings. And Mr. Southern's argument really today reduced less to a Jenks error and more a Doebert error, that Acosta shouldn't have been allowed to testify. I agree, and I think to some extent that goes to weight of the evidence more than admissibility. I think you have here, as far as what Meredith Acosta did talk about, well, and first of all, the reports and charts summarize everything, but Meredith Acosta explained her process. She explained that she documented the work for each of her analyses. She explained that she participated in accreditation for the lab. She had taken regular proficiency testing. All her work was peer reviewed, so to the extent there is a Doebert issue, I think that's clear to understand. To the extent that she shouldn't have been allowed to testify because they didn't have all the underlying things, I think that goes back to a discovery sanction, and this Court's procedures have always been you enforce the least severe sanction to get the desired remedy. The remedy is disclosure. The judge didn't find that the prosecutors were in bad faith. It was explained the prosecutors, when requested by two of the counsel a couple of weeks ago, that they were going to be given a new trial for the underlying things. The prosecutors went to the crime lab, got what they could. Actually, the prosecutors first requested information. They got something. They realized that wasn't enough. After being told that wasn't enough, they went to the crime lab to find other things, found what they can. When Meredith Acosta came back into town, she went into the crime lab and found more documents. It's not perfect, but it was disclosed. It was testified to, and again, there's just been no showing. And what Rule 16 sanctions did Judge Zaney impose? I don't think there was a— The government couldn't use certain documents. I can't remember the exact thing. That's my understanding. If I'm wrong on that, Judge Dickinson, I'll— Acosta made the last witness or not? Was not the very last witness, but I believe it was the second to last. And the government did agree to put Meredith Acosta on at the end of the case to allow defense to have that option. I think there were two small witnesses after Meredith Acosta, but nothing that I remember of any long. If I'm incorrect, I'll try to take a look at that. Also, just for emphasis, Mr. Southern showed a chart to you all this morning, just so you have that. I have that as a government exhibit 309 and 15,301 of the record. Okay, so that was the exhibit in the record 309, but this Jasmine Perry exhibit, is that created for oral argument here? I believe Ms. Hockentrich created that for oral argument, yes. That's not a trial exhibit, I believe. Right. Moving on, a number of the counsel talked about sufficiency for the VICAR counts, and all of them mentioned nexus to the enterprise. And Judge Dickinson, you, I think, specifically asked a few of those questions. I want to talk briefly, before I go into anything specifically, about your questions about this enhancing the strength of a gang. Judge Jones, I think you pointed out that it was a coincidence that gang members are doing multiple cases. Well, when it comes to nexus, I think you take a look at some of the common traits showing the VICAR motive. And we put these in our briefs, and these are collected from courts from all over. But some of the things that have been allowed to show a VICAR motive, or someone gaining entrance or maintaining position in the enterprise, is the excessive nature of the act, talking openly about retaliation, bragging about the violence. But rather than other cases, this case, what was the government's theory that this, what was the purpose of this enterprise? Was it to traffic drugs? Traffic drugs and also protect its members and supporters. OK, but so if we try, because as I read Jones one, we've got to go murder by murder and show the nexus to the enterprise. So if it's to sell drugs, are you capable of, sir, let's go through a couple of the murders, the Haines murder. Where's the evidence that that related to drugs rather than avenging this fellow Giz's death? Sure. There were two motives. One was avenging Giz's death, which again… Put that aside. What's the record site for evidence connecting that murder to any sale of drugs? Refer the court to 3422-23 and 72… 34 what? 3422-23, which would be Daryl Franklin's testimony, and 7200-01, which would be Gregory Stewart's testimony, that Haines had someone rob someone named Mooney of crack that Mooney was selling for Gregory Stewart. OK. So basically we have a… I'm just going because your time is as limited as there's the Fabra murder. Can you do the same again? Sure. There's testimony it was retaliation unrelated to 39ers. So if we're doing the Jones one formula, what do you point to? Sure. There's also that it's the kill whoever shot and paralyzed Percy Baker from the Florida projects. And again, this is not a specific drug thing because you take a look at the indictment, Judge Higgins, and it's not just drugs. It is about inflicting violence. That's why I'm asking you to… Again, I thought Jones one, it's hard to do. But so if this one doesn't relate to drugs, this one relates to… Territory and protecting its members and protecting members we had. They wanted to kill whoever shot and paralyzed Percy Baker from the Florida projects, which is part of the Ninth Ward group. And Stewart gave that testimony at 7063-64. Also have 86-46. 86-46. And again, I'll go through any other murders you want to take. Well, the only other one, it's very helpful to me because, of course, it's sort of quintessentially, I think, a jury question. Is there a connection? And so what's the evidence now? The Marshall murder. The Marshall murder… Did it have anything to do with drug sales or is it more the purpose of 39ers to intimidate others? I think it's both. You know, the drug sale would have not have been a 39ers drug sale. Someone from outside the group approaches the 39ers because Michael Marshall wore a wire on that person. And so it was the person outside the 39ers says, I want this person dead. And they don't come to anyone. They come to the leaders of the 39ers and the 39ers say, go to Washington McCaskill. He's the contract killer, basically. And so it is a contract killing. But something that should show that that increases or maintains the position of Washington McCaskill, who's known to do this violence so much that a leader is sending someone else to that. Him doing that killing supports his position of violence. And it also… So it's not any violence done by a gang member, right? And I'm worried about Jones 1 and 6th Circuit-led better case they cite. Agree. You agree? I agree. Violence in and of itself is not sufficient. OK. So again, on the Marshall murder… But it also does not have… I'm sorry. No, what are you pointing to? This is helpful. The murder itself, and we pointed this out in our brief, does not necessarily have to benefit the enterprise. The vicar thing is about increasing one's position in or maintaining or gaining. So it's, does killing someone increase my position? And that's where you have to go back to what other testimony that kind of encapsulates all of these murders. And that's testimony given primarily by Daryl Franklin, but also by Gregory Stewart. And I'll give a few sites here. You need… Is this specific to the Marshall murder? Well, it's specific to all of them, because I don't think you can really… The jury, you do have to go murder by murder. And I agree with that. But I think the rules of the game for the enterprise and what is important to be in the enterprise, the jury can take that and apply that to each of the murders. Marshall was viewed as a confidential informant, was he not? Yes, against the person who came to the 39ers and requested the hit. So, I mean, it's in everybody's interest to knock out a snitch, is it not? Especially in drug dealing. So what more need be said? I don't, I think, I think that's, I think that's a good point. I don't, I think it's a point that, as Judge Higginson's pointing out, is for a drug dealer outside the 39ers, but… You know, without your expertise and Judge Higginson's expertise and without knowing the entire record, I'm looking at this the way the juror would, and I'm thinking, my gosh, they go around and kill each other, and then they have big parties where they flash thousands and thousands of dollars. What more do you need to… I don't think you need anything else, Judge Jones, especially in light of… It's all reasonable inference that they're all in it together. Agreed entirely. Especially with the other evidence that was presented that applies to all of those, including the testimony that you need a team of killers to have a successful operation. As long as you'll go and squeeze, and this goes to the maintaining increase, as long as you'll go and you'll go and squeeze the trigger, that's what matters. The members were expected to handle their business, meaning kill when necessary, and they were ridiculed if they weren't, and there was evidence that Jasmine Perry was ridiculed on two occasions where he shot what they called cowboy shooting, of just shooting out loud and then, in one situation, actually standing over someone and hitting them numerous times but not killing them. The testimony was, you kill one of ours, we're going to kill one of yours, and we're going to strike first, we're not going to wait. And all of that was about protecting their enterprise, which was a drug enterprise, and was also the protection of members. And, Judge Jones, as you point out, the jury can take all of that and see a bunch of gang members going out and killing people. And it wasn't just one shot, and this is another thing that helps prove the bycar motive. An affront to one was an affront to all. That's why so many of the revenge matters here support the enterprise, support the killing that was in furtherance of that member's position in the enterprise. Acts committed in broad daylight, where everybody can see them. And then the excessiveness of the EH or the act. If you look at all of the evidence we have here, this was never a situation where someone put a bullet, one bullet into a head. It was 20 to 50 bullets, depending on what was going on. It was sending a message. And they enlisted fellow gang members to commit the act. So even in the Michael Marshall matter, where Washington McCaskill is going for somebody else, he's getting Leroy Price and Ashton Price to go with them. So the nexus is there. For all of them, the nexus is there. And our brief talks about whether it's a drug motive, whether it's related to something else. Specifically, counsel brought up the Jerome Hampton and Renetta Lowe. But Hampton was a hated member from the Calio Project area. He was a problem. And he had planned to kill Merle Offrey, who was a leader of the 39ers who started supplying drugs into the 3NG. So Offrey told Stewart, get them out of the way. It's related to the enterprise. It's related to everything. And all the evidence of nexus is there. Moving on to the guilty plea and the factual bases. And Judge Higginson, I think you brought up that this is probably more of a brute. I'll combine it with severance to some extent, but this was much more of a brute issue than a severance issue. But I think also, as you pointed out, the heavy redactions in here take this away from the brute problem. Bruton, I think this court was Gibson, I believe, called Bruton a narrow exception that does not preclude admitting a confession of codependent. But let's have it redacted, not facially incriminating. And the question is— with this case, and it's really just asking you for any precedent. I mean, usually Bruton—the government's got to flip people, and they flip the top two people here, Franklin and Stewart. And then you've got to disclose, and they're going to get impeached with their own factual bases. But we've got to redact it to comply with Bruton. What's really unusual, though, unless you can tell me there's a case, is the government charges the drug conspiracy and then recharges the drug conspiracy. And in opening and closing, the jury's told, you're going to hear four current defendants pled guilty. You're going to get their factual bases. But the others didn't. And then in comes Perry and Lewis's factual basis. And especially for someone like Neville, but I guess even Oney's factual basis implicated all 39ers. How could a jury possibly think, well, the very charged drug conspiracy that four of the people that we're looking at pled guilty to, the others aren't? I mean, those factual bases are going to kill the others. That's my concern. I'm not aware of a case with these specific facts. That's a fact. Facts are hard things. No, I'm just asking you—I'm asking you a case not about the facts. I'm asking you, can you think of a case where the government gets current defendants to plead guilty, and then their factual basis, not against cooperators, is offered, but we have other people who didn't? Can you think of any case? No, I can't. This is a— You need— This is a kind of— So Bruton becomes a problem, and I'm just interrupting you because of time, and then you do appropriately confess error under Nuttall, and now at least it's the Lewis and Perry. So we have the Justice Jackson concern sort of on steroids, and then we actually have a mistake. We have a mistake, but I think the case we've cited is Ramos-Cardenas for—what you have here is you don't have the blanket facially incriminating. We don't have Curtis Neville's name in it. It's an address. That is a mistake. But the inference is much more indirect here, and I think that's where the Ramos-Cardenas case looks at. It's not the direct implication of guilt. We should have done better. No doubt about that. But it's not the in-your-face incrimination that the Bruton issue is really coming at. I thought you were confessing error on Bruton. We confess error. We think it's harmless. Okay. But you're not pressing, then, we review for plain error here? We argue that it is plain error because there was no objection to the redacted admission under Vasquez, is what we cited. Otherwise, Bruce— But Vasquez is a case where there was no objection at all to the confession. These guys objected endlessly. So— I think—I'm sorry. No, are you—what's your position? This is a harmless error preserved, or are you trying to convince us with some site other than Vasquez that we would apply plain error? I think—I'll put it this way. I don't think it matters. I think we win the harmlessness either way, and I'm trying to remember exactly how we stated it in our brief. I think we did argue for plain error. Even if it's plain error, you go down to the fourth—I'm sorry to be obstreperous, but you go down to the fourth prong. Does it interfere with financial justice? I don't think it does. I also don't think it does in reference of other evidence in the case, which is why I would believe, one, under plain error, we wouldn't meet the third prong. Yeah, I'm not disputing plain error. But if it was preserved, and therefore it's the government's burden to prove harmless, it's hard to cross-examine a factual basis of a co-conspirator, right? Agreed. But the evidence coming in the co-conspirator of the statement, one, the judge didn't instruct the jury to review the evidence against individuals count by count, but also the other evidence in the case against Curtis Neville, which included testimony of 3397 to 3400 of the record, which would have been Daryl Franklin's testimony, where Curtis Neville took trips to Houston to get drugs. And there's other testimony that he went—that they went to Houston to get a kilo of heroin at a time. There was testimony at 7048, Gregory Stewart's testimony, that Neville would get heroin from Stewart, that he sold heroin. At his house were found four scales, a heroin press, a bottle of Manitow, some bagged heroin, two guns. Is it Detective Cox that was asked about the factual base—O'Neill's factual basis, do you remember that? On redirection. I think I have a record site on—I apologize, Judge, I can't remember who it was. I know the exhibit is at 15293 to 96, and I also have some testimony of 3126 to 27 of the record, which that may be Detective Cox's testimony. I apologize for that, but that's where I have there. And also for Neville, other evidence that involved is after the Little John Haynes shooting, Gregory Stewart makes a call to Leroy Price, mentioning that the 410, the gun that Neville had, it is—its government's exhibit 276 and 277, which was a series of Title III calls, the transcripts can be found at 15,099 to 15,235 of the record, specifically Session 9311. So I think there's other evidence other than just the factual basis. Let me go back to this Bruton thing as evidence of adoption. Other defendants adopted the Bruton issue, right? I believe they did, Judge. But as to each defendant, the analysis would have to be factually distinct. Agreed. Sir, moving on, we'll just kind of tie into a little more of the severance articles, tying in from—just moving on from the Bruton issue there. As you mentioned, Judge Higginson, this was a big conspiracy, and with the unusual crossover, obviously, of what you have. And this is—the government put this in its record. What basically happened is you have four defendants who plead, one of those defendants starts cooperating, this is developed, and why we have a separate case as opposed to—that's just how it happened. You would never have any of these problems if the four that pled and you want to impeach them with their pleas were tried separately from the other six that didn't, because the other six just can't do anything about the factual basis. That problem would not—that problem would not be there, because those factual basis came in for those four defendants alone. However, the— You're saying they're just—they were hugely redacted. Hugely redacted, and again, any inferences indirect under the case that we mentioned, that it just doesn't have that in-your-face problem. And also, this is not— The government did or didn't use this in closing argument? They said—the government said to the jury, you're going to hear that four of the co-conspirators— the jury mentioned in an opening statement—I believe the government mentioned an opening statement that four of the defendants had already pled to the conspiracy, which is why they were not charged with the conspiracy. I think that was an opening statement. I'm drawing a blank on the closing argument, Judge. I'll double-check and give information to you if it's different. I don't remember offhand, but I will try to double-check that. But what you have here in the case of Severance in a six-week trial, a conspiracy trial, unlike McRae, where the defendants here were charged, not with one conspiracy but three conspiracies, where they involved—multiple members of them took part in the different murders, there is a risk of something, but there is always going to be some spillover evidence, and spillover evidence or evidence that necessarily goes to one defendant and not the other happens. And you take a look at the magnitude, it's just not here. The spillover—whatever spillover presence happened from those four factual bases to those four defendants in a six-week trial with all these witnesses and these pages, just doesn't seem like that would require the severance under ROKA, and it doesn't seem like it shows the prejudice where—or reaches the McRae standard where a severance should have been warranted. I'm trying to—I may have missed one, but I'll check. The last thing, the last topic was Mr. Solomon Doyle's immunity issue. We've argued this. Our position is simply he just did not gain immunity. He pled guilty to the 11-107 drug conspiracy. The part of the— That's a drug case. That was the drug case, right. The drug conspiracy in 11-107. His plea agreement said that he would be immunized—and I'm just paraphrasing now—but immunized for other drug trafficking crimes if he told other—he told law enforcement the nature of this. So I think we disagreed with counsel on this. We don't think the immunity provision just flipped on automatically. He ended up just convicted of the RICO conspiracy. Which, in itself, is not a drug trafficking conspiracy. It's broader. How is it not after the fact a crime of violence? It's sort of what is that conspiracy? I would say at this point, Your Honor, it's a RICO conspiracy. We have drug trafficking conspiracies. We have 924 conspiracies. This is a RICO conspiracy. His argument is the government breached the non-prosecution agreement. When do we assess that? Is it just the motion to dismiss, or does it have any relation to what happens after the verdict? I think it was—I think he also brought it up in motion for—or re-raised it in motion for new trial. But I think that's assessed at the time of the motion. But at the time of the motion to dismiss, you still had the substance of violent counts in there. He was charged with that. That would be appropriate under his non-prosecution agreement. It's just the way it plays out. The law develops the particularized verdict. Suddenly, the RICO conspiracy is all that's left. And the RICO conspiracy is broader than the drug trafficking conspiracy with different elements. So I don't see where his immunity—I don't see where we breached it, first and foremost. I think the acquittals of all the—of the murder counts that he was charged with take that issue away. And since he was never issued—never convicted of a 924, anything with McLaren or 28Js really doesn't apply to his client anymore anyway. But the RICO conspiracy is broader than the drug trafficking conspiracy. Different elements. Different facts. It's a different thing. You know the group and you join it to further the enterprise. And there's evidence that he was with the group. There's evidence testifying that he was around it. There's evidence that he was in the hotel room with Gregory Stewart, where Gregory Stewart's Manitou was, for heroin. So it's there. And it's not prevented by the immunity agreement. Other than that, Judge, I know we've—I know, again, there's been a lot of briefing, especially I think we gave you an exceptionally long brief, which I apologize for, and there's been a lot of argument. I welcome any other questions from the court. One area that came up was the proof, just a sufficiency issue, as to Peters. Was he just a supplier to Stewart? Thank you. I'm sorry. We have evidence, one, running the room for Gregory Stewart, where the 39ers would prepare their drugs, and he got heroin fronted from Stewart, took Stewart to catch sales, sold crack and cocaine and heroin for Stewart, and that's at page 7048 of the record. There also is a series of Title III calls, again, in that government's Exhibit 277. The government below talked about sessions 2187, 3380, 4310, 8340, and 17166. Those are not ROA-paid sites. The ROA for the Title III calls are 15,099 to 15,235, and every phone call transcribed starts with a session number. So that's the session numbers I get. So that's just some of the evidence right there where it wasn't just a buyer-seller relationship. I have one other question, and that is why—what explains this letter that you sent on December 28th that said, we disagree with the Capers decision, the government is evaluating whether to seek further review, but we're not even going to argue? Yeah, I don't understand that at all. Why are we sending it? Yes. Sure, the reason I sent the case, first of all, Judge, obviously the aggravated RICO crime of violence argument is being made a few places around the country. There's not a lot of case law on it. It's still developing. Honestly, four of the cases are coming out of our district. So is the government—well, then that would seem right to put the impetus on the government if they believe that's an important part of enforcing the law to defend it. Well, and is it—well, for the 924—for the question of whether a RICO crime of violence—whether an aggravated RICO conspiracy is a crime of violence, we made that argument here in light of McLaren and his foreclosed—although our 28-J letter of August has preserved it for further review. And so that argument still exists. It's not preserved for further review, is it? The harmlessness—we're not pressing the harmlessness argument in this case, Your  We're still preserving the aggravated RICO for that. That hasn't changed that. Our 28-J of last week was only in light of saying we're not going to press the harmlessness argument at pages, I think, 102 to 104. And that was—even though Capers is outside of circuit. Because there's so little case law in this area, one, I just felt— But Capers is following McLaren or Jones, right?  And McLaren is one of the cases it cites. I brought it to the Court because there is so little case law. I think any case in this area is probably instructive. I felt sort of duty-bound to bring it to you to say there's another case. It caused me to go back and look at Jones again and where, on the harmlessness where we were arguing initially, just mostly, the evidence is different. The evidence is different. And we still believe the evidence is different. And the evidence would show a sufficiency. It would survive a sufficiency, 924. Because of the burden and re-looking at Jones and how it looked at the—a little more at the arguments and a little more at the indictment and the purpose and scope of the enterprise. I have to write a long thing in an opinion that says the government feels it's bound by so-and-so, but it's not even going to argue harmlessness, and therefore we must vacate all those convictions. It's not a— I don't make it lightly. Don't take it lightly, Judge. Well, I mean, if you—that doesn't make the government look too good if you try to challenge capers on cert. Well, I think the—I don't know what the government will ultimately decide on that. This was in consultation with, as the Court knows, before I concede any error. I'm talking, you know, much more outside my office with other people. It's not something we did lightly. It is something that I just think, on the burden on this particular one, this is not necessarily the issue. Going forward, it's avoidable, right? The defense asked for a special verdict. The Court didn't give it. If it had been a special verdict, we had unanimity on the drugs, it wouldn't have this problem. Well, going further, we won't have this problem because, at least as things stand right now in this circuit, an aggravated RICO conspiracy cannot serve as a crime of violence. It's gone. It's not, you know, except that— But had the defense instruction, ironically, been given, none of this would exist, right? The problem— Well, right. But at the time, there certainly was a difference, and the residual clause was maybe, maybe not. There isn't—we thought a colorful argument that the RICO conspiracy could be considered, but obviously it's developing where it is. This is a—I understand, Judge Jones, it's not something we did lightly. However, we do feel it's the best thing to do in light of the burden and in light of what issues need to go up. So that's why we did that. We do feel comfortable on the sufficiency for the VICAR and for the other cases that even though the 924s will change, we believe there is sufficient evidence for all the other counts. I do need to bring up one housekeeping matter, Judge, on that 28J letter. I mentioned the 924 counts. There is one 924 count in the case that is not predicated. It doesn't have the alternate theory on it. It's count 44, which I believe is against Curtis Neville for a possession of a gun in furtherance of a drug trafficking crime. I don't believe that has the duplicate, so that's not really the RICO problem or the aggravated problem. Well, wait a minute. Count 44? Yes, and I realize, Judge, that I missed it in my chart. Not in the chart. It's not in the chart, but I could tell you in my brief that it would be. Which defendant? Which defendant? Curtis Neville. And this is at page 70 of my brief, Your Honor. It's the evidence supporting Neville's 924C conviction. While I don't think that's affected by McLaren or anything else, I do think, however, you would have to vacate the sentence because he got a 300-month consecutive sentence on that. And if the other 924 counts are vacated, that is no longer a second in successive that would impose a 300-month. So I think the sentence, at the very least, would be affected on that. And I apologize. That was something I recognized over the weekend. Not even over the weekend. I said yesterday, looking through this again. I apologize to the court and the counsel for just looking at that. Did you sit through the trial? I did not. You did not? I was not a trial member. I just had just reviewed the record. So if I miss anything, that's on me. I apologize. I've taken more. Something that Neville didn't bring up today but was in the brief was did hearsay come in through Sergeant Dillon? Could you, did the government address that in the brief or? I don't believe we addressed that in the brief. Or at least it's not an issue that it's popping out of my head. I know there was, I know there were some challenges to Special Agent Wood's testimony. I'm just not remembering offhand. It's not popping out to me as something that I'm thinking of today where I can give you a clear answer on that, Judge. With that, unless there are any other questions from the court, we'll submit on our brief and our 20HK letters and ask for the brief there. Thank you very much, Your Honor. Thank you. Okay, we have a little five minutes left. Thank you, Your Honor. Two quick factual corrections or clarifications that I would like to make, both involving the state court Kentrell-Hickerson transcript where in the CASCA letter was an exhibit. The first clarification is none of these defendants were involved in that trial. That trial went around mid-2016, right on the eve of our trial. It was the cooperators that overlapped there but not these defendants. The second clarification is if you look at the actual portion of the state court transcript, it's record site 1593, you see Alex Kalinda ask McCaskill about a different letter. He says, he quotes a March 21st letter and he describes it in the transcript. They then enter a whole volume of McCaskill to Kalinda letters as State Court Exhibit 247. That was a Globo exhibit. That's where it is. It's in that Globo. It's in the Globo exhibit. Not mentioned in the transcript. Correct. It's not mentioned in the transcript and we received the majority of the other letters from that Globo exhibit but we did not receive the McCaskill letter. Judge Higginson, I want to address the points that you were making on the fact that it was somewhere in a public record. The district court considered that and specifically rejected it in a footnote in its order. It said the defense counsel was not required to troll through the criminal records of Brady obligations and that's correct under controlling law. This court in Johnson v. Dretke, site 394F3D332 explicitly said, if the state failed under a duty to disclose the evidence, then its location in a public record is immaterial. And I think our case is actually very similar to a Second Circuit case, United States v. Payne, in which the government failed to disclose an affidavit that was filed in the public record but the court said that the defense had reasonably assumed that the government would disclose it because the government had disclosed other publicly available materials to the defense and that's exactly our situation here. That would explain why Judge Zaney sort of shifted more just to harmlessness. He didn't find that you had it and he didn't say there was an attribution break. Yes, Your Honor. Judge Zaney did not address the collaboration between federal and state agents but I think there are several undisputed record sites that established that cooperation even from the appeal record. If I may go through them briefly, FBI agent Wood in our trial said that Kalinda was a collaborator. He was the initial point of contact with the cooperators including McCaskill and that he had quote unquote developed McCaskill, the cooperator in this federal court file. That's record site 11661 to 11665. The federal prosecutors in this case interviewed the cooperators including McCaskill with the record site 1566 footnote 99. When the five cooperators in this federal case flipped, both the U.S. attorney's office and the ADA's office were parties to the federal plea agreement. The government at our trial seemed to concede that this close collaboration required it to produce materials from the related state court prosecution because we received volumes of Brady and Giglio material from the state court files including things that were also in the public record at the state court level. So it was reasonable for the defense to assume that we were receiving as part of Brady-Giglio these state court materials including materials that were in the public file. If I could turn briefly now to the point of materiality, I think a theme in some of the questions and maybe Mr. Boynton's argument was there was all this other impeachment evidence, why would this McCaskill letter have made a difference in light of all this other impeachment evidence? Well, I'd like to direct the court to Smith v. Kane, a United States Supreme Court opinion which I think is pretty on point. The cite to that is 565 U.S. 73. And in that case, the government failed to disclose an eyewitness statement by one of the witnesses that seemed to contradict or at least muddy the trial testimony that he gave. On appeal, the government advanced various reasons to try to explain away the undisclosed statement, explain why it would be harmless, the jury would have believed all this other evidence. Well, the Supreme Court explicitly rejected that line of argument and said it would be about what contradictory statements the jury might have believed. What mattered in that case was that the defense had the right to use the undisclosed statement and it did not matter how the jury might have weighed it in light of the other evidence. And this court has also held that in Lacaze v. Warden, again, that was cited in the Barnes reply brief. In that case, there was undisclosed evidence of bias. The government agreed not to prosecute the witness's son but a multitude of other evidence of bias came out in that case. The government had given the witness leniency in exchange for cooperation. So once again, the government in that case argued essentially it's immaterial, the error is harmless because the witness was impeached on this evidence of bias. Again, this court in that case rejected that line of argument and said materiality should not turn on which of two competing sources the court determined in hindsight a jury would have considered more important. Once again, I think the critical inquiry on materiality is that the defense had a right to confront the cooperators with the McCaskill letter and the jury had a right to consider it. And I would like to emphasize that is the only release that the defendants are asking for here on the McCaskill letter. This court in Alvarez v. City of Brownsville held on bond that the Brady right is part and parcel to the constitutional right to a fair trial under the due process clause. And that is all that the defendants are asking for here on the McCaskill letter. A new trial. A new trial so they can exercise their constitutional right to due process in a fair trial so the most critical piece of evidence and then weigh it as the jury sees fit. I would welcome any other questions. Otherwise, I have nothing. Thank you, Gail. I don't think so. Thank you. Thank you.